**STATE OF VERMONT**

**ENVIRONMENTAL COURT**

| | | |
|---|---|---|
| Secretary, Vermont Agency of | | |
| Natural Resources, Plaintiff, | } | |
| | } | |
| v. | } | Docket No. 226-11-99 Vtec |
| | } | |
| Lake Arrowhead Used Cars, | } | |
| Defendant. | | |

Decision and Order on Motions regarding Penalties

The Secretary of the Agency of Natural Resources is represented by Catherine Gjessing; in the underlying proceedings that resulted in the Judgment Order of March 4, 2002, Defendant Lake Arrowhead Used Cars was represented by Daniel S. Triggs, but in the subsequent proceedings on whether the penalties should be reduced, Defendant was represented by its owner, Bruce Moulton, representing himself.

The 2002 order was issued in a contempt proceeding for Defendant′ s failure fully to comply with a consent order (Assurance of Discontinuance) entered into by Plaintiff and Defendant in late 1999, regarding abandonment of a radon-contaminated well. During the pendency of the proceedings leading up to the 2002 order, the well was closed and not used, but had not been filled with concrete to insure that it could not be used in the future.

In 1993 Defendant had obtained a state subdivision permit for a two-lot subdivision in Milton, and had obtained a state water supply and wastewater disposal permit to construct a building on Lot 1 of the subdivision. The permits contemplated that the building would be supplied with drinking water by connection to the municipal water system, and required certification by an engineer that the connection to the municipal water system was properly installed, prior to occupancy of the building.

Defendant conducts a used car business in the building on Lot 1, and parks and displays the inventory of used cars for the business outdoors on Lot 1. Defendant washes the inventory of used cars to keep them looking attractive for prospective customers, using a large volume of water. Due to the expense of using large volumes of municipal water for this purpose, Defendant drilled a well on Lot 1 to develop a substitute source of cheaper water. In 1997, Defendant requested an amendment to the 1993 state permits to substitute the drilled well as a water supply source. However, that amendment was denied because the drilled well was contaminated by radon, a radioactive contaminant occurring naturally in drilled wells in this area of Vermont.

This Court's 2002 decision discusses the reasons why radon and radionuclide contamination is of concern in water used for drinking and for household uses such as washing and particularly for showers, as radon readily escapes to the air when radon-contaminated water is sprayed into the air and can be breathed in as a mist or aerosol, increasing the risk for lung cancer. Radon-

contaminated water can be treated for household use by filtration through an activated-carbon filter or by aerating the water in the outside air where the radon can dissipate and be diluted by the greater volume of air.

In 1997, the Agency notified Defendant of the contamination and directed Defendant to abandon[1] the drilled well and immediately to connect the building to the municipal water supply. In 1998, the Agency sent Defendant a Notice of Alleged Violation for failing to abandon the radon-contaminated well and failing to connect the building on Lot 1 to the municipal water supply. In late 1999, Defendant and the Secretary of the Agency of Natural Resources entered into an Assurance of Discontinuance that was entered as a court order. It required Defendant to complete the construction and connection to the municipal water service line, to submit the written report of a Vermont-certified registered engineer, and to abandon the existing radon-contaminated drilled well.

Defendant did connect the building to the municipal water line, but constructed the connection differently from the approved plans. Defendant applied for approval of the amended plans in 2001, but sought to continue the use of the drilled well solely for outside washing of the cars. However, the water system did not receive the amended approval because the amended application was not ruled to be complete and because the drilled well had not been abandoned. During the pendency of the present litigation, Defendant closed and stopped using the drilled well, but did not fill it in with concrete to render it unuseable, continuing to seek approval of its use for car washing.

Defendant uses the municipal water supply for all water supply within the building. Defendant connected the drilled well to a hose bib separate from the system connected to the municipal water system, to avoid the possibility of cross-connection or contamination of the municipal water supply, but as of the proceedings resulting in the Court's 2002 order, the approved plans had not been submitted so that the Agency could verify this fact.

Defendant sought to continue the use of the drilled well solely for outside washing of the cars, to avoid paying municipal water fees for the amount of water needed for car washing. However, as of the proceedings resulting in the Court's 2002 order, Defendant had not actually filed any application or proposal with the Agency to maintain the drilled well for this purpose only, and had not proposed any treatment system for that water to protect the health of the employees, customers, neighbors or passers-by who might be exposed to the aerosol spray from such car washing.

Accordingly, the 2002 Judgment Order found Defendant to be in violation of the 1999 consent order (Assurance of Discontinuance) by failing to obtain approval of the connection to the municipal water supply line, by failing to certify construction of the building's water system in accordance with the approved engineering plans, and by failing to abandon (that is, to fill in with concrete) the radon-contaminated drilled well. The March 2002 Judgment Order required Defendant 1) within 30 days to submit all the remaining engineering information required to complete the amendment application to the Agency; 2) to decide whether to pursue the concept of installing a treatment system for the radon-contaminated well and using its water solely to wash cars, and, if so, to determine within 21 days with an engineering consultant and the Agency

or Department of Health whether such a proposal is conceptually feasible; and 3) within forty-five days either to abandon the drilled well and to submit certification that it was properly abandoned, or to file a complete application proposing a treatment system to allow its water to be used solely to wash cars. The March 2002 Judgment Order also required the parties to file an amended Assurance of Discontinuance if such a treatment system were approved, and required the well's abandonment within two weeks after, and if, such a treatment system were denied. The Agency served the March 4, 2002 order on Defendant on March 11, 2002.

Because the proceedings leading to the March 2002 court order were filed as a petition for contempt rather than as either an enforcement of a final order under 10 V.S.A. § 8014 or as a new administrative order under 10 V.S.A. § 8010, the Court had no jurisdiction to impose a penalty for past violations or for violation of the 1999 consent order (Assurance of Discontinuance). Being restricted to imposing a coercive prospective fine, the March 2002 order required Defendant to pay a penalty of $50 per day for failure to meet the first deadline (numbered 1 above); and to pay a penalty of $100 per day for failure to meet the other deadlines. The Agency does not request that penalties be paid with respect to the first deadline, as the application for approval of the water system was complete and approvable except for the issue of abandonment of the drilled well.

The Agency seeks to collect penalties under the March 2002 order for some portion of the period from 21 days after the March 4 order was served on Defendant on March 11, 2002, until September 12, 2002, when Defendant's engineer certified that the well had been properly abandoned. If the entire 164-day period were counted, it would result in a penalty of $16,400.

Over the course of the next several months after the March 2002 order, the drilled well remained closed and not used while the Agency worked with Defendant towards testing the water and determining whether a treatment system would be feasible. At some time in April, 2002, Defendant requested an extension as Mr. Moulton was still determining whether to abandon the drilled well or to find a treatment system to enable its continued use. The well test results by the Agency on May 1, 2002 showed a very high level of gross alpha particles; however, Defendant did not buy the test package for the other testing needed for radium-226 and radium-228 until April 30, 2002, and then learned that those two tests take six and eight weeks to be completed. He informed his attorney, but did not contact the Regional Engineer directly.

The Agency gave Defendant an extension[2] by a letter dated May 1, 2002, for Defendant to contact the Regional Engineer by May 7, 2002, and allowing 21 days after that meeting for Defendant either to abandon the well or to apply for approval of a treatment system for the well. Allowing for the state Memorial Day weekend holiday, it is fair to treat Monday, June 3, 2002 (rather than May 28, 2002) as the date by which compliance would have been due under that extension (or, at the very least, an additional request for an extension should have been made). Defendant consulted with approximately seven engineers regarding the possibility of treating the water, before deciding that the treatment option was not feasible economically. Defendant's attorney did not inform the Agency until a letter received June 19, 2002, that Defendant had decided to abandon the idea of finding a treatment system for the drilled well. That letter also did not request a further extension; it merely stated that Defendant's engineer would be proceeding to implement procedures to seal the well and to certify its abandonment.

If Defendant had requested an extension, the Agency would have granted an extension of two weeks to 30 days to actually have the well abandoned and the engineer's certification filed. Thus, if the extension request had been made by the expiration of the first extended deadline on June 3, 2002, the Agency would have extended the compliance date at most to July 8, 2002, the Monday after the July 4 holiday weekend.

The well was in fact abandoned (that is, was filled with concrete) on or about August 27, 2002, based on the receipt for the concrete; the engineer's report of the abandonment was filed with the Agency on September 12, 2002. Even giving the benefit of all possible extensions to Defendant, the period of noncompliance with the March 2002 order was 51 days (from July 8 to the actual abandonment on August 27, 2002) or 67 days (to the engineer's certification). As there was evidence of Defendant's difficulty in getting the engineer to perform work in a timely fashion, we will use the August 27, 2002 date. The penalty for this period accrued under the March 2002 order would be $5,100.

Defendant has spent approximately $40,000 on the water system, presumably including his unsuccessful efforts regarding the drilled well. When the March 2002 order was issued, Mr. Moulton was in Florida from February 20 on a buying trip for used car inventory for the business. He had to return unexpectedly to Vermont on March 9 to deal with a break-in at his house in which goods were stolen valued at about $30,000, and had to make several court appearances to deal with prosecutions resulting from the break-in. He was served with the March 2002 court order in the present case on March 11, 2002. In mid-March 2002 he also entered into a purchase and sale agreement on other property, on which he expected to close in April 2002, although title and deed problems with that transaction delayed the closing until mid-September. He had to return to Florida March 21 through 26 to complete the buying trip. He was also involved in April and May with serious divorce and custody proceedings, including disputes with his ex-wife over custody and money taken from his business account that occupied most of his attention through June.

Defendant has moved for the Court to forgive the penalties imposed in the March 2002 order for this period, arguing that he had already paid $1,500 in penalties under the 1999 Assurance of Discontinuance, that he had spent around $40,000 on the water system by the time the work was in fact done, that the drilled well was not used during the time period, and that the personal events in Mr. Moulton's life during that period prevented him from attending properly to his business affairs. The Agency seeks at least $2,000 in penalties in recognition of the long period of time necessary to achieve compliance in this matter, the fact that Mr. Moulton did not make achieving compliance a priority in his life at the time, resulting in inadequate communications to the Agency from him and his agents, and the Agency's expenses in pursuing this matter.

It is important to understand that the penalties imposed by the March 2002 contempt order were prospective and accrued automatically under that order due to Defendant's non-compliance with it. The Agency simply needed to prove the dates of compliance or noncompliance under that order.

However, considering the extensions that were granted or would have been granted by the Agency as if they had been approved by the Court, and the arguments of Mr. Moulton and the

Agency, we will reduce the penalty from the $5,100 accrued under the March 2002 order to $3,100, recognizing the costs to the Agency from the long period it took to get this matter resolved, and the need for Defendant to have kept in communication with the Agency about his efforts towards compliance, but also recognizing the personal stress on Mr. Moulton during that period and the amounts he had expended on efforts to achieve compliance. The parties may agree upon a payment schedule for the penalty as reduced by this order, without needing to move to amend this order.

Done at Barre, Vermont, this 5th day of May, 2002.

_____

Merideth Wright
Environmental Judge

**Footnotes**

[1.]    "Abandonment" of a well, as the term is used in the field of water supply regulation and in the Vermont Water Supply Rules, requires filling the well in with concrete, not merely ceasing its use. This method is required so that if the well is drilled through several aquifers or water-bearing layers, the concrete will seal the fractures within the well and prevent the contaminated water from cross-contaminating other wells in the area drawing from uncontaminated aquifers.

[2.]    Technically this extension should have been requested as an amendment of the March 4, 2002 court order; however, it was reasonably treated by the Agency as the period during which the Agency would forbear from seeking to have the penalties imposed under that order